UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

BOBBY WOLFORD TRUCKING &
SALVAGE, INC.; and KARL
FREDERICK KLOCK PACIFIC
BISON, LLC,

Defendants.

C18-747 TSZ

ORDER

THIS MATTER comes before the Court on a motion for partial summary
judgment, docket no. 32, brought by plaintiff United States of America ("United States").
Having reviewed all papers filed in support of, and in opposition to, the motion, the Court
enters the following order.

**Background**

The United States initiated this action against defendant Bobby Wolford Trucking
& Salvage, Inc. ("Wolford Trucking") and defendant Karl Frederick Klock Pacific Bison,
LLC ("Klock Pacific Bison") for violating the Clean Water Act by discharging dredged
or fill material into navigable waters of the United States without the requisite permit.
<u>See</u> Compl. (docket no. 1).  The United States seeks both injunctive relief and civil

penalties. _Id._ In its pending motion, the United States asks the Court to rule, as a matter of law, that Wolford Trucking is liable under the Clean Water Act. _See_ Pla's Mot. (docket no. 32). The United States, however, requests no relief concerning Klock Pacific Bison. _See_ _id._; _see also_ Klock Pacific Bison's Resp. (docket no. 42).

## A.   **The Property**

This litigation concerns 365 acres of real property in Snohomish County, bordered on the south by Ben Howard Road and on the north and east by the Skykomish River. _See_ Vallette Decl. at ¶ 2 & Ex. A (docket no. 33). The Skykomish River constitutes traditional navigable water of the United States. _Id._ at ¶¶ 6-7. During the period when the discharge at issue occurred, the property was owned by Eric and Susan Klock and/or their business, either Klock Pacific Bison or its predecessor, Karl Frederick Klock Pacific Bison, LP. _See_ Compl. at ¶¶ 7 & 9 (docket no. 1); Ex. C to Martin Decl. (docket no. 41-3 at Klock_001524); _see also_ Ex. E to Martin Decl. (docket no. 41-6) (indicating that the Klocks purchased the farm in June 1994).[1] Eric Klock has since died. _See_ Wolford Trucking's Resp. at 11-12 (docket no. 39).

A dominant feature of the property is an "oxbow channel" of the Skykomish River. Vallette Decl. at ¶ 9 (docket no. 33). An "oxbow" is U-shaped meander of a

---

[1] The United States has objected to documents authored by Eric Klock that were submitted by Wolford Trucking. _See_ Pla.'s Reply at 2 n.1 (docket no. 43). The Court has reviewed the various documents, but has considered them only as appropriate under the Federal Rules of Evidence and Federal Rules of Civil Procedure. To the extent that the parties intend to offer at trial materials authored by Klock or as to which he was the custodian, or any other hearsay statements, they shall address in their trial briefs, which are due on November 8, 2019, the admissibility of such evidence.

stream or river. _See_ _id._ In 1938, the oxbow channel was still active, but by 2003, it had

become wetland, as evidenced by aerial images, which are reproduced below.



_See_ _id._ at Ex. B, Figs. 2 & 8 (docket no. 33-2) (cropped and modified).

**B.** **Flood Damage Repair**

In the fall of 2006, the property was damaged by a flood. _See_ Ex. E to Martin

Decl. (docket no. 41-6). The Klocks successfully applied for financial assistance from

the Emergency Conservation Program administered by the Farm Service Agency of the

United States Department of Agriculture. Ex. C to Martin Decl. (docket no. 41-4 at

Klock_003591-92). The funds were to be used to (i) remove debris, (ii) grade, shape,

relevel, and fill gullies created by the flood, (iii) replant vegetative cover, and (iv) restore

fences. _Id._ In early January 2008, a permit for installing flood fencing was issued by the

Washington Department of Fish and Wildlife. Ex. B to Martin Decl. (docket no. 41-2 at

KFKPB_00088-90). The purpose of the project, entitled "Klock Farm, Skykomish River,

Bioengineered Bank Stabilization," was to install three rows of cottonwood boles along

the river bank, which would collect large woody debris and reduce the velocity of flood

water.  *See* *id.*  Wolford Trucking's initial work at the property, which commenced

around June 2008, related to this flood damage repair.  *See* McKellard Decl. at ¶¶ 2-3

(docket no. 40).  In August 2008, the Klocks received checks for the amounts approved

by the Farm Service Agency.  *See* Ex. C to Martin Decl. (docket no. 41-4 at

Klock_003699-700).  The flood fencing appears to have been completed before mid-

November 2008, as indicated by the following date-stamped photograph:



Ex. B to Martin Decl. (docket no. 41-2 at 28 (KFKPB_00361)).

**C.    Discharge of Dredged or Fill Material**

         In June 2010, Colonel Anthony O. Wright of the Army Corps of Engineers wrote

to Eric Klock concerning complaints that had been received about work being performed

at the property.  Ex. C to Martin Decl. (docket no. 41-3 at Klock_001524-25).  Colonel

Wright informed Klock that, to the extent he had placed "fill in wetlands and a side

channel of the Skykomish River," without a permit, he had violated federal law, and he

was directed "to do no further work in the wetlands or waterward of ordinary high water" on the property. *Id.*

In November 2010, Klock met with two members of the Army Corps of Engineers for roughly two hours. *Id.* at Klock_001539. Klock expressed his view that the entire property fell within a "farming or silviculture" exception to the permit requirements of the Clean Water Act. *Id.* Klock grew organic beans on plowed fields west of the oxbow channel and Christmas trees on the eastern side of the property. *Id.* During the meeting, Klock refused to allow Corps personnel onto the property to investigate, accusing the United States Army Corps of Engineers of retaliating against him for his Snohomish County Farm Bureau activities. *Id.* Klock did, however, confirm that Wolford Trucking and another contractor performed grading and soil amendment work at the property, although he was uncertain as to whether Wolford Trucking brought in fill material. *Id.* at Klock_001540.

### 1. First Search Warrant

In March 2011, an agent with the Criminal Investigations Division ("CID") of the United States Environmental Protection Agency ("EPA") applied for and obtained a search warrant. *Id.* at Klock_003318-39, 003357-62. The search warrant affidavit explained that, in April 2010, during a routine flyover of the Skykomish River, an agent with the National Oceanic and Atmospheric Agency ("NOAA") and a biologist with the Washington Department of Fish and Wildlife observed filling and grading activities at the property, near the oxbow transecting it. *Id.* at Klock_003325-26. The search warrant affidavit further indicated that, in June 2010, while conducting surveillance, EPA-CID

agents observed several large dump trucks entering and leaving the property.  *Id.* at

Klock_003327-28.  According to the search warrant affidavit, the trucks, labeled

"Mikelo," would arrive with dirt, unload, and then exit, and a sign on a gate at the

entrance to the property advertised that Wolford Trucking was working at the site.  *Id.* at

Klock_003327-29.  During their reconnaissance, the EPA-CID agents saw that fill

material had been spread into what appeared to be standing water and wetlands.  *Id.* at

Klock_003328.

In August 2010, the EPA-CID agents interviewed the operators of Mikelo

Trucking, Mike and Wade Edelbrock.  *Id.* at Klock_003329.  The Edelbrocks indicated

that they had a contract to haul fill material from a construction project to a location

known as "Bobby Wolford's dump site,"[2] which had, at that time, been in operation and

used by various companies for the past five years.  *Id.*  The Edelbrocks explained that

they had never asked to see a permit because they had contracted with Bobby Wolford,

the owner of Wolford Trucking, who told them that dumping at the property was "okay."

*Id.* at Klock_003329-30.  According to the Edelbrocks, Mikelo Trucking paid a fee to

Bobby Wolford for dumping on the property.  *Id.* at Klock_003330.

In September 2010, agents with EPA-CID and NOAA interviewed Bobby

Wolford and one of his employees, Robert McKellard.  *Id.*  Wolford and McKellard

acknowledged delivering fill material to the property for the previous five years.  *Id.*

They asserted that permits had been obtained by Klock.  *Id.*  They further explained that

---

[2] Whether the Edelbrocks were referring to the individual known as Bobby Wolford or to his
company is unclear from the record.

Klock had requested the fill material, and that Wolford Trucking did not pay to dump at the property. *Id.* McKellard stated that the property was "wet" because "they were attempting to create berms along the side channel [*i.e.*, the oxbow] in an effort to capture the water for irrigation purposes." *Id.*

In November 2010, EPA-CID agents interviewed Eric Klock at the front, locked gate of the property, after he declined to allow them through. *Id.* at Klock_003331. Klock indicated that the side channel or oxbow was an "irrigation pond" that he used to supply water to his fields. *Id.* He admitted to using 60- to 70-year-old trees from the area adjacent to the oxbow to form the flood fencing that had been installed in 2008. *Id.* Klock also stated that Wolford Trucking was dumping fill material on the property every day, and that he did not pay for the fill material because Wolford Trucking needed a dump site and he needed the dirt. *Id.* Klock asserted that permits were not required because he was merely restoring the property to its previous condition. *Id.*

## 2. **Second Search Warrant**

In June 2012, another search warrant was requested and granted. *See id.* at Klock_003365-97 (docket no. 41-4). The affidavit in support of the second search warrant indicated that, in October 2011, after execution of the first search warrant, the Water Quality Manager for Snohomish County contacted EPA-CID to report that Klock was in the process of building, without a permit, a road on the property. *Id.* at Klock_003388-89. Trucks apparently associated with this work bore the logo "Bobby Wolford Trucking." *Id.* at Klock_003389. The second search warrant affidavit further stated that, in March 2012, Jack Miller, who became the Yard Manager for Wolford

Trucking in March 2011, told an EPA-CID agent that, in January 2012, he had stopped all trucks from delivering material to the property and had taken away the Wolford Trucking equipment that Klock had been using because he believed the filling and grading work occurring at the site was "not okay." *Id.* at Klock_003393-94. During the March 2012 interview, Miller indicated that, when previously asked about the requisite permits, Klock told him that the permits had been given to Wolford Trucking and were on file at the Woodinville office. *Id.* Miller further described Klock as "hands on" concerning the fill material delivered to the property; Klock was typically onsite, directing drivers where to dump the soil. *Id.* According to Miller, Klock himself spread dirt around the property, employing equipment borrowed from Wolford Trucking. *Id.*

### 3.  Evidence Derived from Execution of Search Warrants

Based on the investigation to date, experts for the United States have concluded that dredged or fill material has been discharged at the property into approximately 2.9 acres of wetlands and 2,021 linear feet of streams. Vallette Decl. at ¶ 3 & Ex. A (docket no. 33); *see* Lee Decl. at ¶¶ 13 & 16-17 (docket no. 34). According to these experts, the affected wetlands and streams on the property constitute navigable waters of the United States. *See* Vallette Decl. at ¶ 16 (docket no. 33); *see also* Lee Decl. at ¶ 13 (docket no. 34); *see generally* 33 C.F.R. § 328.3 (defining "waters of the United States" for purposes of the Clean Water Act). The discharges occurred in five discrete areas, denominated as (i) the north oxbow fill, (ii) the oxbow edge fill, (iii) the east oxbow fill, (iv) the southeast fill, and (v) the south oxbow fill, as shown in the figure on the next page. Based on Wolford Trucking's records and discovery responses, one of the experts

for the United States has opined that more than 54,000 cubic yards of fill material was delivered to the property between 2008 and 2012.  _See_ Lee Decl. at ¶ 16(a) (docket no. 34).



Ex. B to Vallette Decl. (docket no. 33-2 at Fig. 1) (cropped).

### 4.    **Wolford Trucking's Defense**

Wolford Trucking contends that it has no liability under the Clean Water Act because (i) although it delivered or arranged for delivery of dredged or fill material to the property, it did not itself discharge the dirt into the wetlands and streams at issue, and it did not control the work causing the pollution, and (ii) the areas of the property into which fill was redistributed are not wetlands or streams, but rather are "prior converted

cropland"[3] for which no discharge permit is required, citing § 404(f) of the Clean Water Act, codified as 33 U.S.C. § 1344(f).[4]

In support of its first argument, Wolford Trucking relies primarily on the declaration of its employee, Robert McKellard, in which he denies putting fill in, or operating equipment in, any wetlands. McKellard Decl. at ¶ 5 (docket no. 40). Consistent with Yard Manager Jack Miller's previous statements to EPA-CID, McKellard indicates that Eric Klock told drivers arriving at the property where to go and where to dump their fill material, but McKellard also acknowledges that a "Bobby Wolford Dump Site" sign was hung at the entrance to the property and that Wolford Trucking had a key to the lock on the access gate and could prevent unauthorized deliveries. *Id.* at ¶¶ 6-7. McKellard further explains that a different contractor worked with Klock to excavate sand from the property for use in building roads, and that Klock rented Wolford Trucking equipment, which he used on weekends when McKellard was not present. *Id.* at ¶¶ 8-9.

According to McKellard, after learning that Klock had received a letter accusing him of filling wetlands (*i.e.*, the letter sent by Army Corps of Engineers Colonel Wright),

---

[3] For purposes of the Clean Water Act, navigable waters of the United States do not include "prior converted cropland," meaning areas that, before December 23, 1985, had been drained or otherwise manipulated for the purpose, or having the effect, of making possible the production of a commodity crop. *See* 40 C.F.R. § 122.2; 58 Fed. Reg. 45,008, 45,031-32 (Aug. 25, 1993); *see also* 7 C.F.R. § 12.2(a).

[4] The United States objects to Wolford Trucking's reliance on § 404(f) of the Clean Water Act because the affirmative defense was not pleaded, asserting that it is prejudiced by Wolford Trucking's "dilatory introduction" of the § 404(f) defense. *See* Reply at 8 n.5 (docket no. 43); *see also* Answer (docket no. 7). Because the Court rejects the "prior converted cropland" argument on the merits, it need not address whether Wolford Trucking has waived the defense.

McKellard told a Wolford Trucking supervisor, and McKellard was then transferred to a different job site. _Id._ at ¶ 10.  Several weeks later, McKellard returned to the property and asked Klock about the letter. _Id._ at ¶ 11.  Klock told McKellard that his property did not have any wetlands, that the post-flood restoration project was the reason the property had standing water, and that the agencies did not have jurisdiction because the work related to farming operations. _Id._  McKellard asserts that Klock told him "not to worry" and "not to talk to anyone from the agencies," and never revealed that the Army Corps of Engineers had directed him to cease his activities. _Id._  In some contrast to Yard Manager Miller's recollection that Wolford Trucking did not stop delivering fill material and loaning equipment to Klock until January 2012, McKellard recounts that, shortly after execution of the first search warrant in March 2011, Wolford Trucking sought permission to and did remove its equipment from the property. _Id._ at ¶ 13.  McKellard states that he did not thereafter go back to the property, _id._, but he does not indicate whether other Wolford Trucking employees continued to perform services for Klock.  Wolford Trucking contends that McKellard's testimony raises genuine disputes of material fact, which preclude summary judgment, concerning the company's direct or indirect participation in the polluting activities at issue.

With regard to its second defense, premised on a theory that the portions of the property into which fill material was discharged were not navigable waters of the United States, but rather prior converted cropland, Wolford Trucking cites a preliminary Highly Erodible Land and Wetland Determination for the property that was issued in June 2009 by the National Resources Conservation Service of the United States Department of

Agriculture.  _See_ Ex. C to Martin Decl. (docket no. 41-3 at Klock_001419-28).  The

results of the June 2009 preliminary determination were as follows:



_Id._ at Klock_001423 (cropped).

The areas encircled in yellow and labeled were found to be non-highly erodible

land ("NHEL") that was a combination of prior converted cropland and non-wetland

("PC/NW").  _Id._ at Klock_001422-23.  The determination made clear that unlabeled areas

on the map were "not inventoried," _id._ at Klock_001419, meaning that no assessment of

the oxbow channel (or any of the five illegal discharge sites on the property) had been

performed.  The determination also warned that, if a wetland manipulation subject to the

Clean Water Act was being planned, the United States Army Corps of Engineers needed

to be contacted.  _Id._  Wolford Trucking acknowledges that it would bear the burden of

proof at trial concerning any agricultural exemption to the permit requirements of the

Clean Water Act, but it contends that the June 2009 preliminary determination supports a conclusion that the United States has failed to meet its burden, as the party moving for summary judgment, of establishing an absence of factual questions concerning whether the areas of the property into which fill material was deposited are navigable waters of the United States.

**Discussion**

**A.    Standard for Summary Judgment**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole, could not lead a rational trier of fact to find for the non-moving party on matters as to which such party will bear the burden of proof at trial, summary judgment is warranted.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Celotex*, 477 U.S. at 322.

**B.    Liability Under the Clean Water Act**

The Clean Water Act declares "the discharge of any pollutant by any person" to be unlawful unless such discharge is done in compliance with the statute.  33 U.S.C. § 1311.

The discharge of dredged or fill material into navigable waters of the United States requires a permit issued by the Secretary of the Army, acting through the Chief of Engineers, unless the discharge falls within one of six statutorily enumerated categories, including "normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservations practices." *See* 33 U.S.C. § 1344(a), (d), & (f)(1)(A). To the extent such farming activities, however, have as a purpose "bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced" then a permit must be obtained. *See id.* at ¶ 1344(f)(2).

To establish a violation of the Clean Water Act, the United States must prove that Wolford Trucking (i) discharged a pollutant (ii) into navigable waters (iii) from a point source[5] (iv) without a permit. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 937 F.3d 1191, 1197 (9th Cir. 2019) (citing *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)). Wolford Trucking makes no argument that the United States has failed to show, as a matter of law, the presence of point sources and the absence of a permit. Thus, for purposes of deciding the pending motion for partial summary judgment, the Court need not further address the last two elements of the Clean Water Act claim.

---

[5] A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feed operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

### 1.    __Discharge__

With respect to the first element of discharge, although the Clean Water Act imposes strict liability on violators, causation is still a necessary element of a statutory claim.  _See_ _Sierra Club v. MasTec N. Am._, 2007 WL 4387428 at *3 (D. Ore. Dec. 12, 2007).  Causation may be established by showing that a defendant actually performed the polluting activity or that it had control over the performance of the polluting activity.  _See id._ (citing _U.S. Bd. of Trustees of Fla. Keys Cmty. Coll._, 531 F. Supp. 267, 274 (S.D. Fla. 1981)); _see also_ _Puget Soundkeeper All. v. Cruise Terminals of Am., LLC_, 216 F. Supp. 3d 1198, 1223 (W.D. Wash. 2015).  In this matter, the United States has proffered no direct evidence of Wolford Trucking itself dumping dredged or fill material into wetlands or streams on the property.  In contrast, Wolford Trucking has submitted McKellard's declaration denying that he ever personally participated in such polluting activity.  Thus, the Court cannot grant summary judgment in favor of the United States as to Wolford Trucking's actual discharge of fill material into wetlands or other waters of the United States.

The remaining issue is whether the United States has established, as a matter of law, that Wolford Trucking exercised control over the work resulting in the illegal discharge.  The Court concludes that questions of fact also preclude summary judgment on the issue of control.  In reply to Wolford Trucking's first defense, which in essence assigns blame to Klock, the United States relies on three cases for the proposition that Wolford Trucking is liable for the discharges at the property even if it did not actually

perform the activities, but only one of those authorities is instructive, namely *United*

*States v. Tex-Tow, Inc.*, 589 F.2d 1310 (7th Cir. 1978).[6]

In *Tex-Tow*, a barge operator appealed from the imposition on summary judgment

of a $350 civil penalty for discharge of oil in navigable waters of the United States in

violation of the Federal Water Pollution Control Act.  589 F.2d at 1312.  The barge at

issue was in the process of being loaded with gasoline at a dock in the Mississippi River.

---

[6] The other two decisions cited by the United States are distinguishable.  In *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F. Supp. 2d 1070 (D. Col. 1999), a "rural electrical distribution cooperative," the power poles of which had caused the deaths by electrocution of 17 birds of prey, unsuccessfully moved to dismiss several criminal charges of violating the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act.  *Id.* at 1071-72.  The *Moon Lake* Court rejected the defendant's argument that the statutes at issue proscribed only "intentionally harmful" conduct of a "physical" nature "normally associated with hunting or poaching."  *Id.* at 1073-88.  *Moon Lake* was in an entirely different procedural posture than this matter, addressing a defendant's motion to dismiss, rather than a plaintiff's motion for summary judgment regarding liability.  In addition, the district court's analysis in *Moon Lake* is inconsistent with the holdings of the Fifth, Eighth, and Ninth Circuits.  *See United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 488-94 (5th Cir. 2015) (recognizing a circuit split, but agreeing with *Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997), and *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302-03 (9th Cir. 1991)).  In *United States v. Gulf Park Water Co.*, 972 F. Supp. 1056 (S.D. Miss. 1997), the district court granted partial summary judgment on liability in favor of the United States, but that decision does not support a similar result in this litigation.  In *Gulf Park*, the defendants were subject to an action for civil penalties and injunctive relief under the Clean Water Act for discharging effluent into the Mississippi Sound without a permit.  *Id.* at 1058-59.  One of the defendants, Gulf Park Water Company, which owned and operated a wastewater treatment facility, admitted it was liable for the discharge.  *Id.* at 1061.  Thus, the issues before the *Gulf Park* Court concerned only the liability of the other defendants, namely (i) the parent company of Gulf Park Water Company, (ii) the general manager of the wastewater treatment facility, and (iii) the sole shareholder of the parent company, who also exercised day-to-day control over the facility.  *Id.* at 1058, 1061-64.  With respect to the parent company, the district court concluded that the subsidiary was the parent's alter ego, rendering the parent liable for the Clean Water Act violations of its subsidiary.  *Id.* at 1061-63.  As to the individuals, the *Gulf Park* Court ruled that they had sufficient control over the operations of the facility and sufficient personal involvement in the decision to discharge effluent into the Mississippi Sound to render them both liable under the Clean Water Act.  *Id.* at 1063-64.  Unlike *Gulf Park*, this case does not involve a subsidiary acting as the alter ego of a parent corporation, or the liability of individuals who "purport[ed] to act through a corporate entity," *id.* at 1063, and who actually participated in the illegal discharge.

*Id.*  As the barge was filled, it sank deeper into the water and settled onto steel piling that was part of the dock's structure, puncturing the hull and causing the discharge of 1,600 gallons of gasoline into the river.  *Id.*  The barge operator asserted as a defense that it received no warning from the dock owner about the piling.  *Id.*  The Seventh Circuit agreed with the barge operator that causation is an element under the Federal Water Pollution Control Act even though the statute imposes strict liability.  *Id.* at 1313.  The barge operator conceded that the presence of the barge at the pier was a "cause in fact" for the spill, and the *Tex-Tow* Court held that the foreseeability (or statistical probability) of a discharge in such situation sufficed to render the presence of the barge also the "proximate" or "legal cause" of the pollution.  *Id.* at 1314.

*Tex-Tow* applied well-known principles of tort law to the realm of environmental legislation.  According to *Tex-Tow*, strict liability under a federal statute similar to the Clean Water Act arises only if the defendant is both the cause in fact and the legal ("but for" or proximate) cause of a discharge.  *Cf. CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) ("The *term* 'proximate cause' is shorthand for a concept:  Injuries have countless causes, and not all should give rise to legal liability." (emphasis in original)); *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 178 (2007) (Ginsburg, J., concurring) ("proximate cause . . .  entails a judgment, at least in part policy based, as to how far down the chain of consequences a defendant should be held responsible for its wrongdoing").  In this case, Wolford Trucking might well be a cause in fact of dredged or fill material being deposited in the wetlands and streams at issue; Wolford Trucking brought, or arranged for or permitted others to bring, the dirt to the property, it had

1    unfettered access to the property and an ability to preclude others from entering, and it

2    posted or acquiesced in the posting of a sign identifying the property as Bobby Wolford's

3    dump site.

4         Unlike in _Tex-Tow_, however, the Court cannot conclude, as a matter of law, that

5    Wolford Trucking was the proximate or legal cause of fill material being placed in the

6    five areas of the property identified by the experts for the United States.  Delivering fill

7    material to a 365-acre property, much of which is not wetland, does not have the same

8    type of correlation to probable pollution of navigable waters as the operation, in a river,

9    of a barge being loaded with gasoline.  Although Wolford Trucking undisputedly played

10   a role in conveying the soil to the property, to conclude that Wolford Trucking could

11   reasonably foresee that the dredged or fill material would be poured into wetlands and

12   streams without a permit or had control over such illegal activity would require the Court

13   to make credibility determinations and draw unfavorable inferences from the evidence,

14   which are functions not permitted in connection with dispositive motion practice.  _See_

15   _Anderson_, 477 U.S. at 255.

16        2.    **Navigable Waters**

17        In contrast to the question of who discharged the fill material or had control over

18   the work causing the discharge, which must be reserved for trial, the Court concludes that

19   no genuine disputes of material fact exist with respect to the status, as either wetlands or

20   streams, of areas on the property into which fill material was deposited, and the United

21   States is entitled to judgment as a matter of law on the issue.  Wolford Trucking has

22   offered no expert testimony to rebut the opinions reached by Yvonne Vallette, an aquatic

23

ecologist with the EPA, and Lyndon C. Lee, Ph.D., a professional wetland scientist, on behalf of the United States. _See_ Vallette Decl. (docket no. 33); Lee Decl. (docket no. 34). Wolford Trucking instead contends that the June 2009 determination by the National Resources Conservation Service ("NRCS") of the United States Department of Agriculture and Eric Klock's statements about the property being farmland exempt from permit requirements raise factual questions about whether the discharges at issue occurred in navigable waters. Wolford Trucking's argument lacks merit.

As evident from a side-by-side comparison, the NRCS's determination excluded the five sites on the property into which fill material was discharged:

 

Ex. C to Martin Decl. (docket no. 41-3 at Klock_001423); Ex. B to Vallette Decl. (docket no. 33-2 at Fig. 1). The north oxbow fill and the oxbow edge fill are both within the unlabeled (_i.e._, unassessed) region of the aerial view marked up by NRCS (above, on the left). _See_ Lee 2d Decl. at ¶ 7 (docket no. 44). The east oxbow fill, southeast fill, and south oxbow fill (circled in the figure above, on the right) are essentially outside the scope of NRCS's diagram, and thus, the June 2009 determination contains no conclusions

about the nature of those portions of the property. In sum, the NRCS's determination offers no support for Wolford Trucking's assertion that the affected sections of the property constitute prior converted cropland.

Similarly, Klock's hearsay statements do not assist Wolford Trucking, even if they could survive a challenge to their admissibility. To the extent Klock based his beliefs on the NRCS's determination, he misunderstood the information he had been given. To the extent Klock was under the impression that discharge of large quantities of fill material into navigable waters qualified as "normal" farming or silviculture activities for which no permit was required, he misinterpreted the law. *See* 33 C.F.R. § 323.4(a)(1) & (c). "Normal" farming or silviculture activities consist of "plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservations practices," *id.* at § 323.4(a)(1)(i), and do not include "convert[ing] an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced," *id.* at § 323.4(c).

The discharge of fill material at issue in this matter resulted in the complete destruction of some wetlands and, in wetlands that were not totally filled, the accretion of bottom elevations. Lee 2d Decl. at ¶ 8 (docket no. 44); Lee Decl. at ¶ 16(b) (docket no. 34). It also caused "significant and discernable changes in the patterns of water flow and circulation within wetlands and other waters," and converted waters of the United States into other uses, for example, farming. Lee 2d Decl. at ¶ 9 (docket no. 44). Thus, the pollution in question was not related to "normal" farming or silviculture activities,

and Wolford Trucking has not presented any "affirmative facts" to preclude summary judgment in favor of the United States concerning the status of the north oxbow fill, the oxbow edge fill, the east oxbow fill, the southeast fill, and the south oxbow fill oxbow as wetlands or other waters of the United States.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)    The motion for partial summary judgment, docket no. 32, brought by the United States is GRANTED in part and DENIED in part, as follows:

     (a)    As a matter of law, the United States has established that the portions of the property into which dredged or fill material was discharged were, at the time of the discharge, wetlands and streams constituting navigable waters of the United States, that the fill material was from point sources, and that no permit had been issued or obtained for the discharge;

     (b)    Any affirmative defense asserted by Wolford Trucking pursuant to § 404(f) of the Clean Water Act is STRICKEN with prejudice; and

     (c)    Factual questions preclude summary judgment as to whether Wolford Trucking actually participated in or controlled the work causing the discharges at issue, and as to this subject, the motion is DENIED.

(2)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 4th day of November, 2019.

Thomas S. Zilly
United States District Judge