UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>and<br><br>THE TULALIP TRIBES OF WASHINGTON,<br><br>    Intervenor,<br><br>v.<br><br>BOBBY WOLFORD TRUCKING & SALVAGE, INC.; and KARL FREDERICK KLOCK PACIFIC BISON, LLC,<br><br>    Defendants. | C18-0747 TSZ<br><br>ORDER |

THIS MATTER comes before the Court on a motion, docket no. 64, brought by defendants Bobby Wolford Trucking & Salvage, Inc. ("Wolford Trucking") and Karl Frederick Klock Pacific Bison, LLC ("KFKPB") to modify or vacate the Consent Decree entered December 8, 2020, docket no. 63. Having reviewed all papers filed in support of, and in opposition to, defendants' motion, the Court enters the following Order.

**Background**

In May 2018, the United States initiated this action against Wolford Trucking and KFKPB for violating the Clean Water Act by discharging dredged or fill material into

ORDER - 1

navigable waters of the United States without the requisite permit.  See Compl. (docket no. 1); see also Order at 1 (docket no. 45).  The litigation involved 365 acres of real property in Snohomish County owned by KFKPB, which is bounded on the south by Ben Howard Road and on the north and east by the Skykomish River, and which is transected by an oxbow channel (the "Property").  Aerial images of the relevant portion of the Property are reproduced below.



Vallette Decl. at Ex. B, Figs. 2 & 8 (docket no. 33-2) (cropped and modified).

In October 2020, The Tulalip Tribes of Washington (the "Tulalip Tribes") intervened, see Order (docket no. 61), and the parties entered into the Consent Decree, which operated as "a complete and final settlement of the United States' claims" under the Clean Water Act, see Consent Decree at 2 (docket no. 63).  The Consent Decree also contemplated that the Tulalip Tribes would receive portions of the Property subject to an Environmental Covenant that is binding on KFKPB and its successors in interest.  See id. at ¶¶ 15–27.  Defendants now seek to modify or vacate the Consent Decree and to be relieved of any obligation to comply with its terms, arguing that Sackett v. Environmental

ORDER - 2

*Protection Agency*, 598 U.S. 651 (2023), rendered the Clean Water Act inapplicable to the wetlands and streams within the oxbow region of the Property.  The United States and the Tulalip Tribes disagree, asserting that <u>Sackett</u> merely adopted the definition of "navigable waters" that had been applied in this matter prior to the entry of the Consent Decree, and that <u>Sackett</u> did not affect the Court's jurisdiction under the Clean Water Act.

**Discussion**

A.     **Standard for Modifying or Vacating Consent Decree**

A party seeking modification of a consent decree bears the burden of establishing that "a significant change in circumstances warrants revision of the decree." <u>Rufo v. Inmates of Suffolk Cnty. Jail</u>, 502 U.S. 367, 383 (1992).  If the moving party meets this standard, the Court must consider whether the proposed modification "is suitably tailored to the changed circumstance." <u>Id.</u>  In <u>Rufo</u>, the Supreme Court provided examples of the requisite "change in circumstances," including "when the statutory or decisional law has changed to make legal what the decree was designed to prevent." <u>Id.</u> at 388.  The <u>Rufo</u> Court made clear, however, that modification of a consent decree should not be granted when any intervening jurisprudence merely clarified, as opposed to altered, the law.  <u>See id.</u> at 388–90.[1]

---

[1] The <u>Rufo</u> Court observed that, although "a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law."  502 U.S. at 390.  In this matter, however, defendants do not invoke any mutual (or even unilateral) mistake concerning the requirements of the Clean Water Act.

ORDER - 3

B.   **<u>Navigable Waters</u>**

The Clean Water Act prohibits discharging dredged or fill material into "navigable waters" of the United States unless a permit is obtained or a statutorily-enumerated exemption applies.  <u>See</u> 33 U.S.C. § 1344.  The term "navigable waters" is defined as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).  In <u>Rapanos v. United States</u>, 547 U.S. 715 (2006), the Supreme Court attempted to construe the term "waters of the United States," but was unable to issue a majority opinion.  Instead, four justices concluded that the Clean Water Act was limited to (i) certain "relatively permanent" bodies of water that are "connected to traditional interstate navigable waters" and described in ordinary parlance as "streams, oceans, rivers, and lakes," and (ii) wetlands that have "a continuous surface connection" with such bodies of water, which renders difficult determining "where the 'water' ends and the 'wetland' begins."  <u>See id.</u> at 742 (Scalia, J., joined by Roberts, C.J., and Thomas and Alito, JJ.).  Four other justices believed that deference was owed to the U.S. Army Corps of Engineers, which treated as "waters of the United States" any wetlands that were "adjacent" to tributaries of traditionally navigable waters.  <u>Id.</u> at 787–88 (Stevens, J., dissenting).  One justice wished to adopt a "significant nexus" test, which would qualify wetlands as "waters of the United States" if the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" <u>Id.</u> at 779–80 (Kennedy, J., concurring).  In <u>Sackett</u>, the Supreme Court adopted the analysis articulated by Justice Scalia for the plurality in <u>Rapanos</u>.  <u>See</u> 598 U.S. at 671 & 675–79.

ORDER - 4

In this matter, over a year before entry of the Consent Decree, the United States moved for partial summary judgment against Wolford Trucking, asserting under both the <u>Rapanos</u> plurality's test and Justice Kennedy's "significant nexus" approach that the wetlands and streams within the Property constitute "navigable waters."  <u>See</u> Pl.'s Mot. at 10–14 (docket no. 32).  Wolford Trucking offered no expert testimony to rebut the opinions proffered by the United States and no challenge to the analysis performed pursuant to the <u>Rapanos</u> plurality's standard, which was subsequently embraced by <u>Sackett</u>.  Instead, Wolford Trucking focused on a June 2009 determination by the National Resources Conservation Service of the U.S. Department of Agriculture that, contrary to Wolford Trucking's contention, contained no conclusion about the nature of the wetlands and streams within the oxbow channel transecting the Property.  <u>See</u> Order at 18–20 (docket no. 45).

The Court concluded the United States had established, as a matter of law, that "the portions of the property into which dredged or fill material was discharged were, at the time of the discharge, wetlands and streams constituting navigable waters of the United States."  <u>See id.</u> at 21.  No motion for reconsideration or similar relief was filed during the year after the Court issued its prior Order and before the Consent Decree was presented to the Court for approval.  Defendants had ample opportunity to contest, with respect to the now binding standard, the classification of the wetlands and streams at issue as "navigable waters," but they did not do so, and they have not made the requisite showing that "a significant change in circumstances warrants revision" of the Consent Decree.  <u>See Rufo</u>, 502 U.S. at 383.

1    Even if <u>Sackett</u> could, however, be understood as having an intervening impact on
2    the applicable law, defendants' motion to modify or vacate the Consent Decree would
3    lack merit.  This case is not like <u>Rapanos</u>, in which the wetlands were a substantial
4    distance (11 to 20 miles) away from traditional navigable waters.  <u>See</u> <u>Rapanos</u>, 547 U.S.
5    at 720.  This case is also not like <u>Sackett</u>, in which the wetlands were near, but separated
6    by a 30-foot road from, an unnamed tributary, which fed a non-navigable creek, which
7    ran into Priest Lake, an intrastate (as opposed to interstate) body of water.  <u>Sackett</u>, 598
8    U.S. at 662–63; <u>see also id.</u> at 707 (Thomas, J., concurring) (explaining that the "so-
9    called 'tributary' (really, a roadside ditch) across the street from the Sacketts' property is
10   not a water of the United States because it is not, has never been, and cannot reasonably
11   be made a highway of interstate or foreign commerce").  This matter concerns not only
12   wetlands, but also perennial streams, that are not merely "nearby or "neighboring," <u>see</u>
13   <u>id.</u> at 676 & 679–83, but rather are within an oxbow channel that "abuts," is "adjacent"
14   to, is "hydrologically connected" to, and/or remains a part of, the Skykomish River,
15   which has been designated by the U.S. Army Corps of Engineers as traditional navigable
16   water ("TNW").  <u>See</u> Vallette Decl. at ¶¶ 6–16 (docket no. 33); Lee Decl. at ¶¶ 5–13
17   (docket no. 34).

18    Defendants contend that, because the United States' experts did not use the phrase
19   "continuous surface connection" to describe the relationship between the wetlands and
20   streams in the oxbow channel and the Skykomish River, their opinions do not support a
21   conclusion that the wetlands and streams are "waters of the United States."  Defendants'
22   argument, however, ignores that the term "continuous surface connection" was coined by
23

ORDER - 6

Justice Scalia and first articulated within the *Rapanos* plurality opinion.  Thus, the proper time for defendants to have attacked the United States' experts' declarations on this basis was before the Court granted partial summary judgment in November 2019.  Defendants' assertion also fails to consider the words actually used by the United States' experts, which indicate without doubt that the oxbow passage, and its wetlands and streams, have the requisite "continuous surface connection" to the Skykomish River.  Lee Decl. at ¶ 5 (docket no. 34) (indicating that, in the southeastern portion of the Property, a perennial stream enters and flows from the Skykomish River); Vallette Decl. at ¶ 11 (docket no. 33) (explaining that "[t]he wetlands in the north oxbow, oxbow edge, east oxbow, and southeast fill area are 'adjacent' to a TNW (the Skykomish River) or [a relatively permanent tributary]" and that the "wetlands in and along the oxbow channel . . . have an unbroken surface or shallow subsurface hydrologic connection to the current main channel of the Skykomish River").

     In support of their assertion that the oxbow section of the Property does not have the requisite "continuous surface connection" with the Skykomish River, defendants submitted, contemporaneously with their reply, the declaration of Derek Klock, a member of the limited liability company (KFKPB) that owns the Property, and a son of KFKPB's founder, Eric Klock.  *See* Klock Decl. at ¶¶ 1–2 (docket no. 77).  Neither the United States nor the Tulalip Tribes have sought to strike Klock's declaration, but it was filed in a manner that inappropriately precluded them from responding.  In addition, the content of Klock's declaration is unpersuasive.  Klock states that "[f]or as long as [he] can remember there has been a farm access road from roughly the central east side of the

ORDER - 7

property that starts north of Ben Howard Road" and "runs mostly north to the river and then turns west and crosses north of the oxbow and south of the river." *Id.* at ¶ 2. According to Klock, the access road "has been usable in all but extreme weather flood events," and he "do[es] not recall any time when there was a continuous flow of water between the oxbow and the river." *Id.* at ¶¶ 3–4. Klock was born in 1987, *id.* at ¶ 4, and his parents purchased the Property in June 1994, *see* Order at 2 (docket no. 45), when he was only six or seven years old.

The documentary evidence (reproduced below) indicates that the access road did not even exist until approximately 2006, when Klock was enrolled at the University of Washington. Klock Decl. at ¶ 4 (docket no. 77) (indicating that Klock began attending the University of Washington in 2005, transferred to Washington State University in 2009, and was not at the Property with any regularity from 2005 until 2012). Thus, Klock cannot be viewed as having personal knowledge or reliable recollection about the useability of or lack of flooding near the access road.

 

**2003:** Vallette Decl. at Ex. B, Fig. 8 (docket no. 33-2)　　**2006:** Lee Decl. at Photograph 18 (docket no. 34-4) (modified)

ORDER - 8

1    Moreover, Klock's declaration fails to address the extent to which his father
2 discharged or arranged for others to discharge fill material into the oxbow channel. To
3 the extent that the access road serves as any evidence of non-continuity between the north
4 oxbow region and the Skykomish River, the record reflects that it does so as a result of
5 activity that violated the Clean Water Act. <u>See</u> Vallette Decl. at Ex. A, Table 2 (docket
6 no. 33-1) (indicating that fill was deposited across 2.39 acres in the north oxbow area for
7 the purpose of extending the access road). In 2006, the "downstream [north] end of the
8 main oxbow area" was still "intact." <u>See</u> Lee Decl. at Photograph 18 Notes (docket
9 no. 34-4). By mid-2008, however, clearing, filling, grading, and other earthwork activity
10 had begun in the north oxbow region, and it continued until at least 2010 and perhaps into
11 2012. <u>See</u> Lee Decl. at ¶ 16 (docket no. 34).



**2008:** Lee Decl. at Photograph 19 (docket no. 34-4)

**2009:** Lee Decl. at Photograph 20 (docket no. 34-4)

**2010:** Lee Decl. at Photograph 17 (docket no. 34-4)

ORDER - 9

Defendants rely on these efforts to sever the oxbow channel from the Skykomish River as a basis to unwind the Consent Decree, asserting that, under *Sackett*, "[w]etlands 'separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like' are no longer 'adjacent wetlands.'" Defs.' Mot. at 12 (docket no. 64). *Sackett* does not stand for such proposition. To the contrary, as recognized in *Sackett*, "a landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered" by the Clean Water Act. 598 U.S. at 678 n.16. Nothing in *Sackett* supports defendants' contention that their activities contributing to the destruction of wetlands and streams in the northern portion of, or elsewhere on, the Property somehow render the Clean Water Act inapplicable or deprive the Court of jurisdiction.

## Conclusion

For the foregoing reasons, the Court ORDERS:

(1) Defendants' motion, docket no. 64, to modify or vacate the Consent Decree entered December 8, 2020, docket no. 63, is DENIED, and the Consent Decree remains in full force and effect.

(2) The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 8th day of December, 2023.

Thomas S. Zilly
United States District Judge